## AFFIDAVIT OF TASK FORCE OFFICER JAMES PICARDI

I, Task Force Officer James Picardi, Drug Enforcement Administration, United States Department of Justice, being duly sworn, depose and state under oath as follows:

## Introduction and Agent Background

1.       I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), and have been so since 2002.  I am currently assigned to the Boston Office of the New England Field Division.  I have served as a police officer in Revere, Massachusetts, since 1991. I was promoted to the rank of Sergeant in 1996 and served as a narcotics detective for four years. In September 2002, I was sworn in as Task Force Officer and began working with the DEA on that date through the present date. During my time as a Police Officer and Task Force Officer, I have participated in numerous investigations and arrests involving infractions of state laws, including Massachusetts General Laws, Chapter 94C, and federal laws, including Title 21, United States Code, Sections 84l (a)(l) and 846.  Some of the investigations and arrests were in cooperation with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); the Federal Bureau of Investigation ("FBI"); Massachusetts State Police ("MSP"); local police agencies; and DEA Task Force II. In addition to my training with the Massachusetts Criminal Training Council Recruit Academy and yearly in-service training, I have participated in courses aimed at educating police investigators in drug interdiction, detection, and recognition, as well as case presentation.  I have participated in an accredited 80-hour narcotics investigation course sponsored and taught by the DEA and have attended numerous narcotics related training classes, including DEA training classes pertaining to telephonic and internet communications.  During my training and through my experience, I have observed marijuana, cocaine, heroin, and other narcotics. I am aware of the

prices commonly charged on the street for these substances, the methods of packaging them, and the jargon used in their distribution. I have received training in field-testing controlled substances. I have participated in nearly all aspects of narcotics-trafficking investigations at the state and federal levels, including but not limited to, the arrests of narcotics offenders after lengthy investigations that involved investigative techniques, such as undercover purchases of narcotics by police officers and/or federal agents and controlled purchases of narcotics by other sources. I have been involved in multiple Title III electronic-surveillance investigations during my tenure at DEA. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations. I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other court applications.

2.  The facts in this affidavit come from my personal observations, electronic surveillance, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

3.  Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often use multiple vehicles to transport drugs and drug proceeds, and that often these

vehicles are registered in the names of third parties to avoid law enforcement scrutiny.

4.          I am currently a case agent participating in the investigation of Isneldy GRULLON ("GRULLON") a.k.a.  JOEL ("JOEL"), Victor AMARANTE ("AMARANTE") a.k.a MIKE ("MIKE"),  Jhon BRITO-SANTOS ("BRITO-SANTOS") and others as-yet unknown or unidentified (collectively, the "TARGET SUBJECTS") for a number of offenses, including the distribution of controlled substances and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841, conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, and money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957 (collectively, the "TARGET OFFENSES").

5.          I make this affidavit pursuant to Rule 41 of the Federal Rules of Criminal Procedures in support of applications for search warrants to search the following:

a. The "**AMARANTE RESIDENCE**," located at **21 East Park Avenue, Lynn** Massachusetts 01902, as more fully described in Attachment A-1;

b. The "**BRITO-SANTOS RESIDENCE**," located at **81 Gardiner Street, Apartment 2, Lynn**, Massachusetts 01905, and a **green 1999 Mazda Protégé** used by both AMARANTE and BRITO-SANTOS that bears Massachusetts registration number 7GC324 and vehicle identification number ("VIN") JM1BJ2222X0117363, and that is registered to Victor AMARANTE, 65 Centre Street, #12, Lynn, Massachusetts (the "**AMARANTE VEHICLE**"), as more fully described in Attachment A-2;

(Collectively, the "TARGET LOCATIONS"), and to seize evidence, instrumentalities, fruits of the crime, and contraband, as more fully described in Attachment B.

6.          Based on the facts set forth in this affidavit, there is probable cause to believe that (a) the TARGET SUBJECTS have committed, are committing, and will continue to commit one or more of the TARGET OFFENSES; (b) the TARGET SUBJECTS have used, are using, and will continue to use the TARGET LOCATIONS to commit the TARGET OFFENSES, and to keep and to protect records, proceeds, and paraphernalia derived from and related to the TARGET

OFFENSES; (c) that AMARANTE and BRITO-SANTOS have used, are using, and will continue

to use the AMARANTE VEHICLE to travel to and from the AMARANTE RESIDENCE, and the

BRITO-SANTO RESIDENCE, to meet with customers and co-conspirators, and to facilitate the

commission of the TARGET OFFENSES; and (d) that objects and documents located in the

TARGET LOCATIONS will constitute and/or will lead to evidence, fruits, and instrumentalities

of the TARGET OFFENSES, as well as to the identification of other individuals who are violating

those and related offenses.


7.      The facts of this affidavit come from my personal observations, other law

enforcement officers and agents, electronic surveillance, physical surveillance, pen register data,

telephone toll records, and my personal review of records and reports relating to the investigation.

This affidavit is intended to show that there is probable cause for the requested warrants and does

not set forth all of my knowledge about this matter.

**Probable Cause**

**Background of Investigation**


8.      Since March 2018, the New England Field Division Boston Office of the DEA, the

Massachusetts State Police, and Revere Police Department have been conducting an ongoing

investigation of a drug trafficking organization ("DTO") believed to have supplied Fentanyl which

contributed to the death of Danielle CAFARELLI on or about March 23, 2018 in Revere,

Massachusetts.  This investigation has led to identification of Isneldy GRULLON a.k.a. "Joel"

("GRULLON"), AMARANTE, BRITO-SANTOS, and others known and unknown that are

engaged in narcotics trafficking and distribution in and around the Greater Boston area.  On April

17, 2018, the Honorable M. Page Kelley, United States Magistrate Judge (District of

Massachusetts), signed a warrant 18-6136-MPK authorizing the use of a pen-register and trap and trace device on 323-924-7389, the cellular telephone used by the GRULLON DTO (the "Target Telephone").   On April 25, 2018, the Honorable M. Page Kelley, United States Magistrate Judge signed a warrant (18-MJ-6196-MPK) authorizing the government to obtain precise location information about cellular phone 323-942-7289 (the "Target Telephone") being used by members of the GRULLON DTO to distribute narcotics.  On June 7, 2018, the Honorable M. Page Kelley, signed a warrant (18-MJ-6230-MPK) authorizing the installation and use of a GPS tracking device on the AMARANTE VEHICLE.   On June 12, 2018, the Honorable M. Page Kelley, signed a warrant authorizing a first renewal for the continued use of a pen-register and trap and trace device on the Target Telephone.  On July 25, 2018, the Honorable M. Page Kelley signed a warrant (18-6243-MPK) authorizing the installation and continued use of a GPS tracking device on the AMARANTE VEHICLE.  On August 7, 2018, the Honorable M. Page Kelley signed a warrant (18-6136-MPK) authorizing a second renewal for the continued use of a pen-register and trap and trace device on the Target Telephone.

9.      As set forth below, on six separate occasions since May 10, 2018, an undercover law enforcement agent posing as a drug customer has purchased suspected cocaine and heroin by calling or texting the Target Telephone.  On all six occasions Victor AMARANTE, either by himself or with others, participated in the sale of the narcotics to the undercover law enforcement agent and on one occasion BRITO-SANTOS sold suspected heroin to the same law enforcement agent, on behalf of AMARANTE.   On all occasions, the undercover law enforcement agent has communicated with AMARANTE using the Target Telephone to arrange the drug deliveries, while investigators conducting physical surveillance have observed either AMARANTE or BRITO-SANTOS using the AMARANTE VEHICLE to make those deliveries on several occasions.

10.     AMARANTE (a male born in 1989), is a suspected narcotics distributor who is currently using the Target Telephone (323-942-7389), which has an unlisted subscriber name and address.  Based on this investigation and my training and experience, I believe AMARANTE currently resides at the AMARANTE RESIDENCE located at **21 East Park Avenue in Lynn**, Massachusetts.     According to the Massachusetts Registry of Motor Vehicles (RMV), AMARANTE was issued a Massachusetts Driver's License on May 8, 2008, which currently lists his mailing and residential address as 65 Centre Street, Apartment 12 in Lynn, Massachusetts 01902.  AMARANTE has a Massachusetts Criminal History which includes arraignments in Lawrence District Court in 2010 for Abuse Prevention Act, Stalking in Violation of a Restraining Order, and Intimidation.  These charges were dismissed in June 2013.  In 2009 AMARANTE was arraigned in Lawrence District Court for Threatening to Commit a Crime, Disorderly Conduct, and Failure to Disperse.  These charges were also dismissed in June 2013.

11.     BRITO-SANTOS (a male born in 1993) is a suspected drug distributor who has used the AMARANTE VEHICLE and sold suspected heroin to an undercover law enforcement agent on behalf of AMARANTE.     According to the RMV, BRITO-SANTOS was issued a Massachusetts Driver's License on March 31, 2016, which currently lists his address of 172 Washington Street, Apt. 14 in Lynn, Massachusetts 01902.  BRITO-SANTOS has a Massachusetts Criminal History which includes a pending 2016 Possession to Distribute a Class B Substance (Cocaine) in the Lynn District Court of Massachusetts (DKT: 1613CR003319A), and an Assault and Battery on a Pregnant Victim which was dismissed in June 2017.  On June 20, 2018, law enforcement agents coordinated a traffic stop of the AMARANTE VEHICLE and identified BRITO-SANTOS as the individual who sold suspected heroin to the undercover law enforcement agent.  On July 26, 2018, law enforcement stopped BRITO-SANTOS a second time in the

AMARANTE VEHICLE during which he provided **82 Gardiner Street, Apartment 2** as his address when issued a criminal citation.

### Probable Cause to Believe that the Target Offenses were Committed

12.　　　Based on my training, experience and familiarity with this investigation, I believe that AMARANTE and BRITO-SANTOS conspire together to distribute controlled substances. Based on physical surveillance, precise location information, pen-register data, GPS location information and undercover law enforcement narcotics purchases, I believe that AMARANTE makes arrangements to sell controlled substances to customers using the Target Telephone, and then, either delivers the drugs himself or on occasion, dispatches BRITO-SANTOS to deliver the drugs to those customers. I further believe that AMARANTE resides at the AMARANTE RESIDENCE and uses his residence to store and prepare drugs for distribution; and that BRITO-SANTOS resides at the BRITO-SANTOS residence and uses his residence to store and prepare drugs for distribution, and uses the AMARANTE VEHICLE to transport drugs and collect payment.  All times set forth below are approximate.

### May 15, 2018: Undercover drug purchase from AMARANTE who used the AMARANTE VEHICLE to complete the transaction

13.　　　On Tuesday **May 15, 2018**, at 10:56 a.m., the undercover detective received an incoming text message from the Target Telephone which read: "Open from Monday to Monday 7 am to 10 pm end only Saturday closes at 8 pm."  Based on my training and experience I believe the user of the Target Telephone sent a text message informing customers the time of day the organization would conduct drug deliveries, "7 am to 10 pm" and Saturday until "8 pm".   Target Telephone Pen-Register data collected on May 15, 2018 indicated the Target Telephone sent

outgoing text messages to approximately 51 unique numbers that day.  Included within the 51 numbers are the telephone number utilized by the undercover detective, the phone number for the deceased, Danielle CAFARELLI, and a telephone subscribed to 15 Hall Street, Revere Massachusetts where agents observed AMARANTE meeting briefly with a male in which the encounter is described below.

14.      Shortly after the receipt of the text message on May 15, 2018, an undercover law enforcement agent placed a call to the Target Telephone and arranged to purchase narcotics from AMARANTE in Revere, Massachusetts.  At 12:17 p.m., the undercover detective received an incoming call from AMARANTE informing the detective he had arrived at the agreed upon meet location.  The undercover detective met with AMARANTE in the parking lot of the Flaming Grill & Supreme Buffet and entered the AMARANTE VEHICLE with AMARANTE, where AMARANTE sold the undercover detective a quantity of suspected cocaine and heroin.  Agents later followed AMARANTE to 15 Hall Street, Revere, where the AMARANTE VEHICLE pulled over and a male from the residence entered the AMARANTE VEHICLE for approximately 20 seconds then returned to the residence.  From my training and experience and my knowledge of this investigation, I believe that the individual entering the AMARANTE VEHICLE did so to purchase suspected narcotics from AMARANTE.

**May 23, 2018: Undercover drug purchase from AMARANTE who used the AMARANTE VEHICLE to complete the transaction**

15.      On **May 23, 2018**, at 10:30 a.m., surveillance agents observed the AMARANTE VEHICLE parked outside of the AMARANTE RESIDENCE.  Shortly thereafter, the undercover detective placed a call the Target Telephone and placed an order with AMARANTE for cocaine and heroin - "white" and "brown."  AMARANTE agreed to meet the undercover detective in

twenty minutes in Revere, Massachusetts.   At 11:04 a.m., surveillance agents observed

AMARANTE exit the AMARANTE RESIDENCE and get into the AMARANTE VEHICLE.

Surveillance agents followed AMARANTE to Revere, where the undercover detective entered the

AMARANTE VEHICLE and purchased suspected cocaine and heroin from AMARANTE.  Upon

completion of the transaction, agents observed AMARANTE meeting with another individual in

a nearby Stop and Shop parking lot in a manner consistent with a narcotics transaction.

### June 15, 2018: Undercover drug purchase from BRITO-SANTOS who used the AMARANTE VEHICLE to complete the transaction

16.      On **June 15, 2018** at 9:15 a.m., Lynn Police Det. Emery and I observed the

AMARANTE VEHICLE parked in front of the BRITO-SANTOS residence on Gardiner Street in

Lynn.  Lynn Police Detectives Emery and Ricupero maintained surveillance of the AMARANTE

VEHICLE.

17.      At 9:55 a.m., the undercover detective called the Target Telephone and spoke with

AMARANTE to arrange the purchase of suspected heroin.  AMARANTE said he was going to

send a "runner" who would sell the drugs for him.  Based on my training and experience, I am aware

that individuals involved in the sale of illegal drugs frequently conduct their drug transactions at

locations other than their residence, and they will dispatch other individuals as "runners" to

distribute narcotics, as tools to avoid detection by law enforcement.  I am also aware that many

dealers will conduct their drug transactions in this manner in an effort to prevent law enforcement

officers from locating their true and primary residence, their drug packaging and stash locations,

assets (such as property, vehicles or currency) derived from drug sales, and records and

paraphernalia associated with the sale of illegal drugs.  AMARANTE and the undercover agent

agreed they would conduct the transaction at the same spot as last time, the parking lot by the

Flaming Grill & Supreme Buffet located on Furlong Drive in Revere, MA.

18.     At 11:00 a.m. the undercover agent placed another outgoing call to the Target Telephone to inquire what time the "runner" would arrive.  AMARANTE told the undercover agent that that the runner had to travel to AMARANTE to obtain the narcotics before the runner could meet the undercover.

19.     At 11:15 a.m., Det. Emery and Ricupero observed BRITO-SANTOS enter the AMARANTE VEHICLE and drive from the area.  Detectives followed the AMARANTE VEHICLE as it travelled directly to the AMARANTE RESIDENCE.  At 11:27 a.m., detectives observed BRITO-SANTOS go into the front door of the AMARANTE RESIDENCE and remain inside for 7 minutes.  BRITO-SANTOS then returned to the AMARANTE VEHICLE and drove away.  BRITO-SANTOS was carrying an item in his left hand when he left the AMARANTE RESIDENCE.

20.     Surveillance agents followed the AMARANTE VEHICLE and, at 11:43 a.m., it returned to the vicinity of the BRITO-SANTOS RESIDENCE.  At 11:47 a.m., agents saw BRITO-SANTOS return to the AMARANTE VEHICLE and drive away.  Surveillance agents followed the AMARANTE VEHICLE directly to the Flaming Grill & Buffet, where it parked in a handicap parking spot out front.  Four minutes later, the AMARANTE VEHICLE  drove across the parking lot, pulled up to the undercover detective's vehicle, and instructed the undercover detective to enter the front passenger side of the AMARANTE VEHICLE.

21.     Inside the AMARANTE VEHICLE, BRITO-SANTOS was on a speaker telephone call with AMARANTE.  The undercover law enforcement agent heard AMARANTE ask BRITO-SANTOS in Spanish how much money the undercover detective had.  BRITO-SANTOS looked at the undercover detective asked with his hands how much money the undercover detective had.

The undercover detective told BRITO-SANTOS that he needed "two," and handed BRITO-SANTOS $100.  The undercover detective heard AMARANTE ask BRITO-SANTOS, in Spanish, to count the money.  After quickly counting the money, BRITO-SANTOS spit from his mouth to his hand two small clear plastic bags containing a brown powder substance suspected to be heroin and handed them to the undercover detective.  The undercover detective then got out of the AMARANTE VEHICLE and met with law enforcement agents.

22.      Surveillance agents followed the Mazda to Peabody and subsequently back to Gardiner Street in Lynn where BRITO-SANTOS parked the AMARANTE VEHICLE and walked across the street towards the driveway of the BRITO-SANTOS RESIDENCE.

### June 24, 2018: Surveillance of BRITO-SANTOS using the AMARANTE VEHICLE and seizure of suspected heroin

23.      On Monday June 25, 2018, at , 10:30 a.m., law enforcement agents initiated surveillance of the AMARANTE VEHICLE while it was parked across the street from the BRITO-SANTOS RESIDENCE in Lynn, Massachusetts.   At 10:54 a.m., agents observed BRITO-SANTOS exit the driveway of the BRITO-SANTOS RESIDENCE, cross the street and enter the AMARANTE VEHICLE.  I observed BRITO-SANTOS place his hand up to his mouth just before reaching the vehicle.   BRITO-SANTOS was also carrying a water bottle.   BRITO-SANTOS entered the AMARANTE VEHICLE and traveled to the corner of Summer Street and Lowell Street in Lynn, MA, where agents observed BRITO-SANTOS get out of the AMARANTE VEHICLE and go into the restaurant for thirty seconds.   Agents then saw BRITO-SANTOS emerge and get into the passenger seat of a Honda CRV.  Agents briefly lost sight of the Honda, and then observed BRITO-SANTOS walking back towards the AMARANTE VEHICLE.

24.      Within minutes, agents located the Honda CRV in the McDonalds parking lot on

the Lynnway, where a law enforcement agent walked up and observed an individual preparing a brown powdery substance, believed to be heroin, into a line on his driver's license. The law enforcement agent knocked on the window and the individual dropped his license and the brown powder onto the floor. Two additional bags of suspected heroin were in plain view in the center console. The individual was cooperative and stepped from the vehicle as additional law enforcement agents arrived to assist. The two bags of suspected heroin from the console and two additional bags of suspected heroin that had fallen to the floor of the car were seized.

25.      The individual was not arrested, but was told the individual could be prosecuted based on the incident. The individual provided information to law enforcement, stating that the individual paid $250 for five bags of heroin. The individual initiated the purchase by calling telephone number 323-342-7389 (the Target Telephone).

26.      Agents continued surveillance of the AMARANTE VEHICLE. It traveled to P&P Tires Service Center at 375 Summer Street where agents observed the AMARANTE VEHICLE up on a lift in one of the garage bays. At 12:15 p.m., BRITO-SANTOS left the repair shop in the AMARANTE VEHICLE and traveled to the AMARANTE RESIDENCE where he arrived at 12:32 p.m., and parked on the lawn by the front porch.

27.      At 12:34 p.m., the AMARANTE VEHICLE left and traveled to Union Street, where agents observed BRITO-SANTOS meet with AMARANTE inside the Rincon Cirollo restaurant for an hour. At 1:30 p.m., BRITO-SANTOS and AMARANTE left the restaurant and traveled to Smith Street, where the AMARANTE VEHICLE parked near the intersection of Union Street. Agents were unable to see where the occupants went. At 2:25 p.m., agents observed BRITO-SANTOS return to the AMARANTE VEHICLE and drive away. BRITO-SANTOS stopped at a boutique by Monroe Street then returned to the BRITO-SANTOS RESIDENCE where

agents observed him walk down the driveway and enter the side door located on the driveway side of 79 Gardiner Street.

**July 26, 2018: Traffic Stop of BRITO-SANTOS using the AMARANTE VEHICLE during which he indicated his address was 82 Gardiner Street, Apartment 2, Lynn Massachusetts**

28.      On **July 26, 2018,** a Lynn Police Officer conducted a traffic stop of BRITO-SANTOS while he was operating the AMARANTE VEHICLE on Chestnut Street in Lynn, Massachusetts. During the traffic stop, BRITO-SANTOS was issued a criminal citation for driving a motor vehicle while having a suspended driver's license. When BRITO-SANTOS provided his address to the police officer he indicated he resided at **82 Gardiner Street, Apartment 2, in Lynn**, Massachusetts. BRITO-SANTOS was released and informed that a summons would arrive in the mail.

**August 1, 2018: Surveillance of BRITO-SANTOS and Unidentified Male using the AMARANTE VEHICLE engaging in suspected narcotics activity**

29.      On **August 1, 2018** agents conducted surveillance of BRITO-SANTOS and an unidentified male using the AMARANTE VEHICLE in a manner consistent with the distribution of narcotics. In particular, at 12:39 p.m. the AMARANTE VEHICLE left the BRITO-SANTOS' residence (81 Gardiner Street, Apt. 2) and traveled to Marr Road in Saugus. Agents saw BRITO-SANTOS go into an apartment door in a building numbered 170-177 of the Laurel Gardens Apartment complex, and exit within one minute. He returned to the AMARANTE VEHICLE and it drove away. Agents maintained surveillance of the AMARANTE VEHICLE as it traveled to 1249 Bennington Street in East Boston, MA where it pulled over to the curb adjacent to the train station parking lot. Agents observed BRITO-SANTOS exit the passenger door of the AMARANTE VEHICLE and walk on foot approximately 500 yards to the Belle Isle

Condominium building located at 145 Bennington Street, Revere.   Agents observed BRITO-SANTOS using a cellular telephone while he was walking.  BRITO-SANTOS entered the lobby door and walk out of sight.  Three minutes later, the AMARANTE VEHICLE pulled away from the curb and drove on Bennington Street to Crescent Ave where it looped the block and pulled in front of the Belle Isle Condominium Building.   Agents observed BRITO-SANTOS exit the lobby door and return to the AMARANTE VEHICLE.   Agents followed the vehicle to Lynn, to the parking lot of the Walmart located at 450 Highland Ave in Salem, MA, where agents lost sight of it among a row of parked cars.   Two minutes later, the AMARANTE VEHICLE left the parking lot and traveled to a restaurant gas station before returning to the BRITO-SANTOS residence.

**August 7, August 9, and August 14, 2018: Communication with the resident of 82 Gardiner Street Lynn Massachusetts regarding BRITO-SANTOS**

30.        On **August 7, 2018**, I spoke with the resident of 82 Gardiner Street in Lynn, the same address provided by BRITO-SANTOS during the July 26, 2018 traffic stop.   The resident reported that BRITO-SANTOS and a female came to the residence on this day to inquire if the resident received a letter for them at that address.  The female told the resident that they had been involved in an accident following which they gave 82 Gardiner Street, second floor, as an address by mistake.  The female said that the mail intended for them would be addressed to Jhon.  The resident told BRITO-SANTOS and the female that they haven't received anything yet, but would bring it over to them when it arrives.  The pair indicated they reside on the second floor at 81 Gardiner Street.  The resident further indicated that the side door located in the side driveway of 79 Gardiner Street residence will lead to access doors to the inside apartments to include the second floor of 81 Gardiner Street.

31.        On **August 9, 2018,** I spoke again with the resident of 82 Gardiner Street, who said

a letter had arrived in the mail that day addressed to Jhon BRITO-SANTOS, 82 Gardiner Street, #2, Lynn Massachusetts, from the Commonwealth of Massachusetts, Lynn Division, District Court Department of the trial court.

32.      On **August 14, 2018**, I accompanied the resident of 82 Gardiner Street to 81 Gardiner Street, Apartment 2, Lynn MA as they delivered the received mail addressed to BRITO-SANTOS.  I was able to observe that access to Apartment 2 of 81 Gardner Street, Lynn can be gained by entering either the side door on the driveway side of 79 Gardiner Street or the open rear door of the residence.  The door to Apartment 2 is a brown door located up one flight of stairs.

### August 8, 2018: Undercover drug purchase from AMARANTE

33.      On **August 8, 2018,** at 10:00 a.m., surveillance agents set up surveillance at both the AMARANTE RESIDENCE and the BRITO-SANTOS residence in anticipation of having an undercover law enforcement agent purchase narcotics by calling the Target Telephone.  Agents observed the AMARANTE VEHICLE parked across the street from the BRITO-SANTOS residence.   They also observed on the lawn outside of the AMARANTE RESIDENCE a 2017 Toyota Highlander (MA Registration 6NKW90) whose registered owner, Dayhana SANTOS-MOYA, also listed an address of 65 Centre St., Unit 12 in Lynn, the same address listed on AMARANTE's driver's license.    At 10:55 a.m., after a brief exchange of text messages, the undercover detective received a call from the Target Telephone and placed an order with AMARANTE for "brown," meaning heroin.  AMARANTE didn't want to meet the undercover detective in Revere because it was "too hot," a term I believe referred to the presence and conduct of law enforcment.  AMARANTE agreed to meet at a location in Chelsea.  At 11:56 a.m., the undercover detective called AMARANTE, who said he was 15 minutes away.  At 11:58 a.m., surveillance agents observed AMARANTE exit the AMARANTE RESIDENCE and get into the

Maroon Toyota Highlander and departed.

34.     At 12:35 p.m., AMARANTE arrived at the meeting spot in Chelsea, where the undercover detective purchased from AMARANTE suspected heroin, which was subsequently field tested and yielded a positive reaction for the presence of heroin.

35.     On **August 9, 2018**, the following day in the morning hours, agents observed the AMARANTE Toyota Highlander used by AMARANTE the previous day parked on the lawn at the AMARANTE RESIDENCE.

### Probable Cause to Believe That Evidence, Fruits, and Instrumentalities of the Crimes Identified Above Will Be Found at the TARGET LOCATIONS

36.     I believe probable cause exists that the TARGET LOCATIONS, as described in Attachment A-1 (the AMARANTE RESIDENCE), and Attachment A-2 (the BRITO-SANTOS RESIDENCE and AMARANTE VEHICLE) will contain evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, as described in Attachment B.

### The AMARANTE RESIDENCE

37.     The AMARANTE RESIDENCE is located at 21 East Park Avenue, Lynn, Massachusetts 01902.  21 East Park Avenue in Lynn, Massachusetts, is a two-story single family, wooden, residential structure with a stone foundation and hip roof.  The exterior consists of blue clapboard with black shutters on the second story front windows.  The number "21" is mounted to the left of the front door at the top of the front stairs.  Entrance to the AMARANTE RESIDENCE can be accessed through the front door.

38.     A search of the law enforcement database CLEAR for AMARANTE returned address results for 21 East Park Avenue, Lynn, Massachusetts 01902. In the course of my

investigation, I also received information from National Grid, a company which supplies electricity for the Target Location, that the subscriber for service at the AMARANTE RESIDENCE is Danery M. CORNIEL.  During the undercover drug buy from AMARANTE on **May 15, 2018**, the vehicle AMARANTE arrived to the meet location in was registered to an Anyelo CORNIEL of 380 Revere Beach Parkway in Chelsea, Massachusetts.  Additionally, investigators have previously installed a GPS tracker on the AMARANTE VEHICLE at the AMARANTE RESIDENCE and have observed AMARANTE at the AMARANTE RESIDENCE on multiple occasions, including as recently as August 8, 2018 when he left the AMARANTE RESIDENCE to deliver narcotics to the undercover detective.

### The BRITO-SANTOS RESIDENCE and AMARANTE VEHICLE

39.         The BRITO-SANTOS RESIDENCE is located at 81 Gardiner Street, Apartment 2, Lynn, Massachusetts 01905.  81 Gardiner Street in Lynn, Massachusetts, is a three-story, three family, flat roof residential wooden structure with an exterior consisting of tan shingles.  The front of the residence contains two front doors.  The number "81" is mounted on the left frame of the of the left side front door and the number "79" is mounted on the right side of the right side door of the residence.   The BRITO-SANTOS RESIDENCE, the location to be searched, is an apartment on the second floor of number 81 Gardiner Street, Lynn Massachusetts.  Entrance to the BRITO-SANTOS residence can be gained from the main door numbered 81 to the second floor, or through the side door on the driveway side of 79 Gardiner Street, or the rear door of the residence.  The door to Apartment 2 is a brown door located up one flight of stairs upon entering the rear door.  The AMARANTE VEHICLE is a green 1999 Mazda Protégé bearing Massachusetts registration number 7GC324 and vehicle identification number ("VIN") JM1BJ2222X0117363.

40.        A search of the law enforcement database CLEAR for BRITO-SANTOS returned

results of 172 Washington Street, Apt. 14, Lynn, Massachusetts 01902. Based on my familiarity

of this investigation, surveillance, as well as GPS tracking data from the AMARANTE VEHICLE

which places the vehicle regularly during the overnight hours in the vicinity of 81 Gardiner Street,

I believe that BRITO-SANTOS resides at the BRITO-SANTOS residence at 81 Gardiner Street,

Apartment 2, Lynn Massachusetts 01902.  On **July 12, 2018**, investigators went to 79-81 Gardiner

Street in Lynn, Massachusetts and based upon their examination of the mailboxes, determined that

for names for 81 Gardiner Street, Apartment 3 are listed as Alina DE LA CRUZ, Webster

GUERRA SILVERIO,  Yocasta SILVERI, Jhancy REYES, and Jhancy GUERRA.  The second

mailbox underneath believed to be utilized by Apartment 2 has stickers in the names D. LEBLANC

and R DONLOP on the lid.  According to the law enforcement database CLEAR, a Robert

DUNLOP with a DOB --/--/1950 resided in apartment 2 of 81 Gardiner Street during April 2018

and as of June 30, 2018 a Miguel ESPINAL, with no date of birth or issued Massachusetts Driver's

license, listed 81 Gardiner Street, Apartment 2 as his address.  Investigators have maintained a

GPS tracker on the AMARANTE VEHICLE at the BRITO-SANTOS RESIDENCE on multiple

occasions, both late at night and early morning hours and have additionally observed BRITO-

SANTOS at the BRITO-SANTOS RESIDENCE on a regular basis.  Beginning on or about June

15, 2015, the AMARANTE VEHICLE began remaining during the overnight hours at the BRITO-

SANTOS RESIDENCE on a regular basis.  According to the resident at 82 Gardiner Street, the

people in Apartment 2 of 81 Gardiner Street, Lynn Massachusetts moved in on or about June 15,

2018.

41.        As described above, I believe that AMARANTE and BRITO-SANTOS are actively

engaged in the distribution of drugs and that they use the TARGET LOCATIONS to facilitate that

distribution. Based on my training and experience, I know that individuals involved in drug trafficking conspiracies require secure locations for their conspiracies to operate. Here, based on my familiarity with this investigation, I believe that AMARANTE and BRITO-SANTOS use the TARGET LOCATIONS as secure places to store and prepare drugs for distribution, to keep paraphernalia and documents necessary to conduct drug trafficking operations safe yet accessible, and to direct distribution by communicating with customers and BRITO-SANTOS.

42.      I also believe that AMARANTE uses the AMARANTE RESIDENCE as a place from which to direct operations of his drug distribution business as well as a means through which to prepare drugs for drug distribution.  I further believe that both BRITO-SANTOS and AMARANTE use the AMARANTE VEHICLE to transport drugs for distribution, to meet with customers, and to collect money in payment for drugs.

43.      Based on my training and experience, including participation in other drug investigations and extensive discussions with other law enforcement officials experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to keep evidence of their drug business in their homes and residences. I am also aware that it is common practice for drug traffickers to store drug-related paraphernalia and records in secure locations such as their residences and places of business for longer periods of time than they keep drugs. I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of AMARANTE and BRITO-SANTOS. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, investigators typically recover drug-related evidence including cash, records, drug distribution materials, drugs, and other valuable items. Based on my training and experience, I believe that:

a) Drug traffickers generally store their drug inventory, drug paraphernalia, drug proceeds, and drug records at or in their residences, businesses, drug stash houses, and/or vehicles;

b) Drug traffickers will also generally seek to store their drug inventory, drug paraphernalia, drug proceeds, and drug records in the residences, businesses, and/or vehicles of relatives, trusted associates, or others in an effort to distance themselves from the drugs they are selling and to shield themselves from detection by law enforcement, or by setting up what is commonly referred to as a "stash house," typically a residence or commercial location registered in the name of others and used to store drugs or to prepare drugs for distribution;

c) Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers.  Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. Further, since drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, body armor, firearm cleaning kits, scopes, holsters and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, on their persons and in their vehicles;

d) Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside of the normal banking system. Accordingly, drug traffickers frequently maintain large amounts of cash and other valuable assets at their residences, businesses, or vehicles, in order to maintain and finance their ongoing business. Drug traffickers also often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering is also generally maintained in the residences, businesses, stash houses or vehicles of those involved in selling drugs or their relatives or trusted associates;

e) Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances, and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the drug traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Here, because he arranges drug transactions throughout the day while at the AMARANTE RESIDENCE, I

believe AMARANTE keeps such records at that location. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

f)   It is common for drug dealers to secrete records of drug transactions in secure location within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

g)   It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to income from controlled substances and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

h)   Drug traffickers commonly maintain electronic and paper book or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cellular telephone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

i)   Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on the cellular telephone(s) and other electronic devices;

j)   Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

k)   Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

l)   Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

m)   Drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at residences or drug stash houses. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking,

particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained;

n) Drug traffickers often attempt to launder/legitimize the proceeds of illicit drug distribution and to otherwise conceal such proceeds from discovery by law enforcement. To do so, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, stash houses, businesses, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

36.        Based on all of the information that I have obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe that AMARANTE and BRITO-SANTOS use their residences to store drugs, documents, paraphernalia, and the cash proceeds of their drug distribution business, as well as documents concerning the disposition of such proceeds. Based on the investigation, I also believe that AMARANTE and BRITO-SANTOS use the AMARANTE VEHICLE to transport drugs and cash proceeds to and from the TARGET LOCATIONS. I believe that drugs, cash, owe sheets, and other documents regarding those activities will be found in the AMARANTE RESIDENCE, as well as in the BRITO-SANTOS RESIDENCE and the AMARANTE VEHICLE.  Finally, I also believe that AMARANTE and BRITO-SANTOS use their smartphones and/or telephones to facilitate the TARGET OFFENSES, to communicate with one another, with drug suppliers, and with customers, and that communications, records, appointments and other information will be found on their

smartphones/telephones, and that their smartphones/telephones will be found on or near them.

**Seizure of Computer and Telephone Related Equipment and Data**

37.          From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. From my training and experience, I am also aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

38.          Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones and mobile phones (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

39.      Based on my knowledge, training, experience, and information provided to me by

other agents, I know that electronic files or remnants of such files can be recovered from

computers, smartphones, and mobile phones months or years after they have been written,

downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer, or from their old telephone to their new telephone.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, storage media in particular, internal hard drives contain electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

40.      Based on my knowledge and training and the experience of other agents with whom

I have spoken, I am aware that in order to completely and accurately retrieve data maintained

in computer hardware, computer software or storage media (as each is defined in the

Definitions section of Attachment B), to ensure the accuracy and completeness of such data,

and to prevent the loss of the data either from accidental or programmed destruction, it is often

necessary that computer hardware, computer software, and storage media (hereinafter,

"computer equipment") be seized and subsequently processed by a computer specialist in a

laboratory setting rather than in the location where it is seized. This is true because of:

    a.  The volume of evidence C storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.  Technical requirements C analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

    c.  Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

41.       The TARGET LOCATIONS may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

**Request to Seal**

42.     Because they reveal the existence of an ongoing investigation, I request that the warrant, this affidavit, and the accompanying applications in support thereof be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants.

**Conclusion**

43.     Based on the information described above, I have probable cause to believe that that AMARANTE and BRITO-SANTOS have violated the TARGET OFFENSES, and that evidence, fruits, instrumentalities of these crimes, as described in Attachment B are contained within the TARGET LOCATIONS as defined above and described in Attachments A-1 and A-2.


_____
James Picardi
Task Force Officer
Drug Enforcement Administration

M. Page Kelley
United States Magistrate Judge
District of Massachusetts

Subscribed and sworn to before me, this ____ 21st day of August, 2018

